GEORGE H. SANDS ET AL., APPELLEES, v. CHICAGO, BURLINGTON & QUINCY RAILWAY COMPANY, APPELLANT.

FILED JANUARY 17, 1907.    NO. 14,640.

Evidence examined, and *held* sufficient to sustain the judgment.

APPEAL from the district court for Hall county: JAMES N. PAUL, JUDGE. *Affirmed.*

*J. W. Deweese, F. E. Bishop* and *O. A. Abbott,* for appellant.

*R. R. Horth* and *Charles G. Ryan, contra.*

JACKSON, C.

The plaintiff had judgment for the value of ten head of cattle which were killed by one of the defendant's trains at a point where, it is claimed, the defendant was required to fence its right of way and neglected to do so. The defendant, on appeal, presents the question of the sufficiency of the evidence to sustain the judgment.

The location of defendant's track with reference to other objects involved in the inquiry presents a situation somewhat confusing and difficult to state so that it may be understood. The cattle were killed at a point distant about two miles from Grand Island. The railroad at that place extends from the southeast to the northwest, and crosses two forks of the Wood river. The railroad

bridges at this point are numbered 13 and 14, No. 13 being the eastern bridge. Between the two bridges a public highway 66 feet wide crosses the defendant's right of way and track east and west. As the traveled portion of the road approaches the railroad from the east, it turns somewhat to the south and crosses the railroad track at nearly a right angle. East of this public crossing the defendant's right of way is not fenced on the north side. North of the public highway and east of the railroad crossing the plaintiffs have a feed yard, where, at the time the cattle were killed, they were feeding about 150 head of steers and heifers. A gate at the southwest corner of the yard opens into the public highway. One of the plaintiffs, who made the measurements, testified that the distance from the gate south to the railroad track was 96 feet, and from the point where the line south to the railroad track crossed the track to the west end of bridge 13 the distance is 75 feet. The distance from that line west to the railroad crossing is not given, although the distance from the west end of bridge 13 to the railroad crossing is variously estimated from 75 to 80 feet. The accompanying plat, although not drawn to scale, may assist in understanding the situation:

The train that struck the cattle was coming from the east, a little behind time, and was running at the rate

of from 60 to 75 miles an hour, before daylight in the morning; which was somewhat foggy on the river bottom. Some time during the night the gate leading into the plaintiff's feed yard was opened, and some of the plaintiff's cattle, probably 50 in number, escaped into the road and onto the company's right of way. The carcasses of the animals were found, one on the south side of the railroad track ten feet east of the crossing, the others west of the crossing, some of them east of bridge 14, others in the west fork of the river, indicating that the force with which they had been struck carried the bodies to the north and west. The testimony of the plaintiff's witnesses tends to prove that the cattle, when they escaped from the yards, crossed the public highway onto that triangular tract between the public road and the defendant's right of way, where there was a small patch of grass north of the railroad track, and thence onto the right of way. Tracks were found very close to the west end of bridge 13, and disclosed that the cattle went from there toward the crossing of the public highway onto the railroad, and that they were running. One of the plaintiff's witnesses testified that the first carcass to the east was found about 60 feet west of bridge 13. The plaintiff's theory is that the cattle, after they escaped from the feed yard, crossed the public highway onto the defendant's right of way, where it should have been fenced, but was not, were scared by the approaching train, and ran west on the company's right of way, and onto the railroad track, where they were struck and killed.

The defendant's section foreman, who was the first man on the ground after the cattle were killed, testified to having been notified that the train had struck some cattle near Wood River; that he went to the crossing at 5:30 o'clock in the morning, found the gate open and the animals lying dead along the track, one about ten feet east of the crossing. It was his judgment that the cattle were struck at the crossing, because of the fact that there was a clot of blood on the planks at the end

of the crossing. He followed cattle tracks from the gate immediately to the crossing. The engineer in charge of the engine testified that the train usually carried from eight to thirteen coaches, he did not know how many they had that morning. The cattle were struck somewhere between 4:45 and 5 o'clock in the morning. The engine was equipped with an electric headlight. The first that he noticed was the eyes of the animals, which he described as green lights, 50 to 100 of them. He applied the brake, the dust flew, and it was all over. He thought the cattle were from six to ten rods away when he first noticed them. He said the traveled portion of the public highway showed white, and that the cattle were all bunched on the crossing—possibly not all of them on the crossing; that they were standing still when he struck them. The fireman testified that when the engine went onto bridge 13 he ceased firing, as was his custom on approaching Grand Island, and dropped his shovel. He saw the engineer make a move, and looked ahead and saw the eyes of the animals. He was on the left side of the engine, and saw one of the animals struck. It fell forward and to the side of the track, evidently the one found east of the crossing, although his judgment was that the cattle were all struck on the crossing. It is the theory of the defendant that the cattle that were killed came directly from the gate, along the public highway, onto the crossing, where they were struck by the passing train, and that any other theory is based upon a mere conjecture not supported by the evidence.

An analysis of the direct evidence, in connection with the facts and circumstances shown to exist, has led us to a different conclusion. When we stop to consider that the entire distance involved in the inquiry would be covered by a train running as this one was in probably less than a second's time, and the tremendous force of a train, carrying from eight to thirteen coaches, running at that rate of speed, it becomes apparent that when the engine struck the cattle, which were shown to have

weighed about 1,000 pounds each, they would be likely to be thrown or carried many feet forward, and it would not be at all improbable that some of them should be found at a distance of 100 or more feet from the point where the collision occurred. The fact that one of the carcasses was found a distance of ten feet east of the crossing indicates that they were struck still farther east of that point; and if the cattle were bunched together on the track, as testified to by the engineer, he was clearly mistaken in stating that they were on the crossing. In fact, it seems remarkable that in the length of time allowed him for observation he should have anything more than a general idea of the location. The direction of the travel of the cattle and the presence of their footmarks on the company's right of way near the east end of bridge 13 disclose that they entered upon the company's right of way at a point where it should have been fenced, and we do not think the finding of the jury was an unreasonable inference from all the facts. In fact, it can hardly be said that it was not the most reasonable. The presence of the blood on the planks of the crossing is hardly to be taken as evidence of the fact that the cattle were struck at that point. It would rather indicate that some one of the cattle, struck at a point farther east, was thrown onto the planks, or, possibly, after the train had passed struggled over the crossing before death overtook it.

Other assignments of error relate to the admission of evidence and the giving of instruction No. 9. It is said that the court erred in permitting witnesses to testify where the ten head of cattle entered upon the defendant's right of way and that there was no fence at the place where they so entered. That particular portion of the evidence to which our attention has been called relates to the direction in which the tracks led from the gate, and, in our judgment, was admissible, as was the evidence that the company's right of way was not fenced at that point where the cattle entered.

The instruction complained of is as follows: "You are further instructed that, if you believe, from a preponderance of all of the evidence in this case, that the cattle of the plaintiffs in question went onto the right of way of the defendant at a place where under the law it was required to fence its right of way, but had failed to do so, and had there gone onto the railroad track, and had from there been driven by defendant's engine and train, or wandered onto the public road or crossing, and were there killed or injured, then and in that case the defendant would be liable; and, if you so find, then your verdict should be for the plaintiffs for such an amount of damages as you believe, from all of the evidence, the plaintiffs have sustained, not exceeding the amount claimed in plaintiffs petition." The objection to this instruction is based upon the assumption that there was no competent evidence in the record upon which it could be based. If we are correct in the conclusions already reached the objection is not well taken, and we recommend that the judgment of the district court be affirmed.

DUFFIE and ALBERT, CC., concur.

By the Court: For the reasons stated in the foregoing opinion, the judgment of the district court is

AFFIRMED.